IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DIANA GALINDO, et al.,

        Plaintiffs,

v.                                          CIV 02-476 KBM/JHG

TOWN OF SILVER CITY, et al.,

        Defendants.

# MEMORANDUM OPINION AND ORDER

This controversy centers around Plaintiffs' allegations that the defendant officers violated their civil rights by entering the home in which they were located. Pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment. The matter is presently before the court on a dozen pretrial motions. Having carefully reviewed the parties' submissions and relevant authorities, I find the motion to strike and motions for summary judgment should be granted in favor of defendants. Consequently, the other motions are moot.

## I.  Background

### A.  Overview Of Incident At The Galindo Residence

Defendant Joe Acosta is a Silver City police officer. His wife, Cynthia Acosta, has a daughter, Elizabeth Acosta, who was sixteen at the time in question and living with her mother and stepfather. Elizabeth did not drive at the time and was dependent on others to pick her up from work at a local McDonald's restaurant. Elizabeth's boyfriend was Michael Anderson, and

both Mr. and Mrs. Acosta were familiar with distinctive truck that he drove.

Mrs. Acosta's sister is Diana Galindo.  Before the night in question, the Acostas had forbidden Elizabeth from going to her aunt's house because, on prior occasions after visiting Ms. Galindo's home, Elizabeth had come home intoxicated.  Ms. Galindo knew that the Acostas did not want Elizabeth in her home.

On the night in question, Elizabeth did not call her mother for a ride when her shift ended at McDonald's at 9:00 and did not otherwise arrive home when expected by other means.  Her mother became concerned and drove to the restaurant.  There she was told that Elizabeth had left with Michael.  Mrs. Acosta drove around looking for Elizabeth and included a drive by Ms. Galindo's home in her search.  Seeing Michael's truck parked out front of the Galindo home, Mrs. Acosta knocked on the door but received no answer.  She returned home and tried to phone the Galindo residence and again received no answer.

Mrs. Acosta called her husband, who was on duty at the time and reported what had transpired.  Mr. Acosta advised her that he would stop by the Galindo residence when he got off work around 1:30 a.m., which he did.  Mr. Acosta likewise saw Michael's truck and knocked on the front door of the Galindo home.  He also received no answer, but did see someone peeking out of the window and heard scuffling and giggling inside the house.  He went home, changed his clothes, and picked up his wife.  They then returned to the Galindo home.

Mr. Acosta remained in the car.  Again, Mrs. Acosta received no response to her repeated knocks at the front door and she proceeded around the back of the house.  There she saw someone running out the back and hop the fence.  She found the back patio sliding glass door open and went into the house.

2

Meanwhile, Mr. Acosta, who remained in his truck this entire time, called the police and two officers responded:  Silver City officer Samuel Rodriguez and Grant County then-Lieutenant Ruben Portillo (for ease of reference, I will refer to them both as officers).  When the police arrived, Mr. Acosta told them that he believed Elizabeth was in the house with her boyfriend and was drinking.  The officers knocked on the front door several times, announcing themselves as law enforcement.  Indeed, Mrs. Acosta, who was inside the house, heard them knocking and announce themselves.  Receiving no response, and being unable to see inside the home due to the windows being covered, the officers walked around to the back patio.

There they saw that the back sliding glass door partially open and could see two minors, one lying on the sofa and the other lying on the floor.  The officers knocked on the sliding glass door and yelled "wake up/get up" to get the minors' attention.  They were unsuccessful.  The kids did not move or in anyway acknowledge the officers.  Fearing for the juveniles' safety, the officers entered the house through the sliding glass door.  At that point, one of the minors roused and indicated that the owner of the house was further into the home.  Mrs. Acosta exited the house at this point.  Headed in the direction indicated by the minor, the officers encountered Michael, who denied Elizabeth was in the house or that they had been drinking.  The officers asked where to find the home's owner, and Michael pointed to the closed door of a bedroom.

After Ms. Galindo came out of her bedroom, she and her daughter spoke with the officers, whereupon the officers learned that Elizabeth was hiding in Ms. Galindo's bedroom closet.  Ms. Galindo indicated that the officers should go get Elizabeth.  They did so.  Elizabeth appeared intoxicated.

The officers took Elizabeth, Michael, and his brother Chad Anderson, to the Grant County

3

Detention Center.  Later the minors were released to their parents.  The officers did not file any incident reports and did not charge Ms. Galindo with any crime.

### B.  Parties And Claims

Elizabeth, Ms. Galindo, her children Joanna and Charles Schroder, and her then-boyfriend, Orlando Garcia, comprise the Plaintiffs in this action.  They sue the four officers they assert were on the scene at the Galindo residence in their individual and official capacities – Mr. Acosta, Officers Rodriguez and. Portillo mentioned above, and Silver City police officer Daniel Barde.  In addition to the Town of Silver City, Plaintiffs name as individual and official defendants five members of its city council, the city manager, police chief, and another officer, Bobby Ruiz.  In addition to Grant County, Plaintiffs name as individual and official defendants four of its commissioners and the sheriff.

Plaintiffs' Complaint raises six claims based solely on federal law and seeks to recover damages under 42 U.S.C. §§  1983 and 1985.  All Plaintiffs first contend they were subject to "unreasonable searches and seizures" in violation of the Fourth Amendment and Article 2, § 10 of the New Mexico Constitution.  Based on the events that give rise to their Fourth Amendment claim, they next claim a violation of substantive due process, alleging that the officers' conduct was "willful, wanton, reckless . . . malicious" and "shocking to the conscience."  They further all maintain that the municipalities are liable for allowing the officers to function in a "climate of deliberate indifference."

In overlapping and additional claims, they all further allege that all defendants conspired to:  "target, retaliate and harass Plaintiffs," not file a police report, give false statements, and conceal or destroy evidence.  The final claim is brought by Ms. Galindo against all defendants for

4

a violation of equal protection, where she alleges that all of the unconstitutional conduct was

directed at her, "out of sheer malice," because she is a single Hispanic female.

## II.  Summary Judgment Standard In Qualified Immunity Context

In separate motions, collectively the Grant County and Silver City Defendants move for

summary judgment on all of Plaintiffs' claims, and in so doing raise qualified immunity as a

defense.  *See Docs. 92, 93, 112, 113.*  Plaintiffs cross-move for partial summary judgment on their

Fourth Amendment and state constitution claim as well as their assertion that Defendants are

estopped from relitigating whether Lt. Portillo was properly trained.  Adding a new theory,

Plaintiffs further move for summary judgment on their assertion that by failing to make a written

report of the incident, the officers violated state law and, hence, violated the Equal Protection

Clause.  *See Doc. 101*.

When, as here, summary judgment is based on the defense of qualified immunity, a

different analytical framework applies.  The test is easy to identify in the abstract.  If a defendant

raises qualified immunity as the basis for summary judgment, the burden shifts to the ***plaintiff*** to

show two things:  (1) a violation of a constitutional right and (2) that the violated right was

clearly established as of the date of the offending conduct.

As the Supreme Court directed in *Saucier,* the analysis of the two prongs is based on

Plaintiffs' allegations and must be conducted in sequential order.  *See, e.g., Saucier v. Katz,* 533

U.S. 194, 201-02 (2001); *Roska v. Peterson,* ___ F.3d ___, 2003 WL 1963209 at *2 (10th Cir.

4/29/03) (to be published)*; Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1312 (10th Cir. 2002);

*Holland v. Overdorff,* 268 F.3d 1179, 1185-86 (10th Cir. 2001), *cert. denied,* 535 U.S. 1056

(2002).  In the Tenth Circuit, Plaintiffs' burden is described as "heavy" notwithstanding viewing

the evidence favorable to them.   "'[T]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitle to qualified immunity.'"   *Holland,* 268 F.3d at 1186 (quoting *Medina v. Cram,* 252 F.3d 1124, 1128 (10ᵗʰ Cir. 2001)).

In the event a plaintiff successfully meets his or her burden under the two-part *Saucier* test, "then the burden shifts back to the defendant, who must prove that 'no genuine issues of material fact' exist and that the defendant 'is entitled to judgment as a matter of law.'"   *Olsen,* 312 F.3d at 1312 (internal citation omitted).   One Tenth Circuit opinion describes the burden shift as such:

> In the end, therefore, the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense. . . . When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be properly denied.

*Id.*   A very recent Tenth Circuit opinion describes the burden shift differently. That is, if a plaintiff meets the burden of showing a violation under clearly established law, then the burden shifts to the defendant "to prove that [the] conduct was objectively reasonable under the circumstances. *Roska, supra,* at ** 13-15 (considering factors of reliance of state statutes and advice of counsel).

In standard summary judgment practice, a fact "is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. . . .   A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Sports Unlimited, Inc. v. Lankford Enter., Inc.,* 275 F.3d 996, 999 (10ᵗʰ Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   "Factual disputes that are irrelevant or unnecessary will not be counted.   *Anderson,* 477 U.S. at 248.   Moreover, "facts" in this

6

context do not include either "[un]substantiated allegations," *Phillips v. Calhoun,* 956 F.2d 949, 951 n. 3 (10th Cir. 1992), or "[o]ptimistic conjecture, undbridled speculation, or hopeful surmise," *Vega v. Koak Carribbean, Ltd.,* 3 F.3d 476, 479 (1st Cir. 1993).

## III.  Analysis

### A.  Motion To Strike

Defendants move to strike exhibits that Plaintiffs listed in an index, but omitted from their dispositive motion. *Doc. 134; see also Doc. 184.* The omitted exhibits consist of photographs of the former Galindo residence, as well as an affidavit and sketch diagram of the home by Ms. Galindo.  For summary judgment purposes, the crucial factual issue raised by the omitted exhibits is whether a gate obstructed passage from the carport to the back patio. *See e.g., Docs. 101, 102.* Hoping to facilitate review of the matter, I ordered Plaintiffs to file a complete set of their exhibits. *See Doc. 163.*

Defendants first move to strike the omitted exhibits because they were not attached to the court's file copy.  Defendants also move to strike the aforementioned exhibits because Plaintiffs did not produce them in discovery.  They further move to strike the omitted photographs as not properly authenticated under Fed. R. Civ. P. 56(e).  *Doc. 134; see also Doc. 184.* Moreover, they note that the Galindo affidavit may not have been prepared until after Plaintiffs' motion and exhibits were filed.  I agree that the exhibits should be stricken.

The Initial Pretrial Report set February 17, 2003 as the date dispositive motions were to be served. *See Doc. 31,* at 10.  Magistrate Judge Galvan later extended the deadline twice, resulting in March 10, 2003, as the date the initial dispositive pleadings were to be filed. *See Docs. 81, 85-86.* Plaintiffs filed their motion for partial summary judgment on the last day of the

deadline.  *See Doc. 101.*

In support of their motion, Plaintiffs submitted a separately-numbered document consisting of only some of the exhibits they cite in their motion.  *See Doc. 102.*  Seven of the exhibits listed on the exhibit index are highlighted by redline type and these exhibits were not attached.  A footnote to the index states:  "Please note the red lettering indicates these were not submitted ***due to page limit restrictions.***"  *Id.* (emphasis added).

This court's local rules limits the number of pages a party can attach as exhibits to a motion.

> **Page Limits for Exhibits.**  Exhibits to a motion, response or reply, including excerpts from a deposition, must not exceed fifty (50) pages unless all parties agree otherwise.  ***If agreement cannot be reached, then the party seeking to exceed the page limit must file a motion in accordance with D.N.M.LR-CIV. 7.***  A party may only file those pages of an exhibit which are to be brought to the Court's attention.

D.N.M.LR-CIV. 10.5 (emphasis added).  The above footnote establishes that no agreement was reached to allow Plaintiffs to exceed the page limitation.  However, rather than filing a motion to exceed the page limits as required by our local rules, Plaintiffs chose instead to forego filing the exhibits.  *Compare Docs. 114, 116* (stipulated motions agreeing to allow party to exceed page limits).

Plaintiffs are aware of the required procedure.  For example, they requested permission to exceed page limits on a response.  *See Docs. 152, 164.*  Even if they were not aware of the local rule at the time they filed their exhibits, they should have been, and failure to comply with the court's rule alone is sufficient grounds to not consider the portions of their argument based on the omitted exhibits.  *E.g., Mitchael v. Intracorp, Inc.,* 179 F.3d 847, 855-56 (10th Cir. 1999); *see*

*also e.g., Jones v. Eaton Corp.,* 42 Fed. Appx. 201, 206 (10th Cir. 2002) ("unsubstantiated assertions of fact were insufficient to create a jury issue and could be disregarded by the district court. . . .  There would be nothing arbitrary or manifestly unreasonable had the court done so. Local Rule 56.1 plainly authorized the court to deem admitted for purposes of summary judgment all material facts set forth in the statement of the movant.  Other courts within the Tenth Circuit employ similar rules and their application has not been questioned."); *Mendez v. Brown,* 12 Fed. Appx. 784, 787 (10th Cir. 2001) ("The court also noted, correctly, that plaintiff, through his counsel, should have been aware of Local Rule 7.1(e).").

Two other compelling reasons warrant "striking" the omitted documents.  According to Ms. Galindo's affidavit  the photographs "were taken on March 9, 2003."  *See Doc. 188,* Exh. 61 (¶2).[1]  However, discovery in this matter closed on February 15, 2003.  *See Doc. 36* (extending discovery deadline)*; see also Doc. 88* (minutes of 2/12/03 JHG status conference noting that deposition of Plaintiffs' expert scheduled for following week).  According to Ms. Galindo's affidavit, the photographs were taken after discovery closed and one day before Plaintiffs filed their motion.  Plaintiffs do not dispute that the photographs and sketch were not disclosed during the discovery process.  In fact, they proffer no reason at all for the belated creation of these materials.  Thus, I find the failure to disclose the evidence neither substantially justified nor harmless and such failure warrants striking the evidence.  *See* FED. R. CIV. P. 37(c) (party who

---

[1]  She asserts that the photographs "accurately represent the physical and structural appearance of my home, carport and patio areas as of the date of May 13, 2000."  *Doc. 188,* Exh. 61 (¶3).  She further asserts that a six-by-six foot gate cordoned off the patio from the carport and that the bottom "half" of the gate "was closed and latched shut" on the night in question.  *Id.,* ¶ 8; *see also id.,* ¶¶4-5.  She states that one of the photographs shows the top part of the gate held open behind pieces of wood.  The bottom part of the gate is missing in the pictures.  *Id.,* ¶ 6.

"without substantial justification, fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed."); *see also Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 952-53 (10th Cir.), *cert. denied,* 123 S. Ct. 623 (2002) (factors at to the harmlessness prong).

Furthermore, the assertion of the presence of a "gate" appeared for the first time in the text of Plaintiffs' motion for partial summary judgment, and was unsupported by any accompanying affidavit.  There is no mention of a gate in any of the deposition testimony before me.  According to the notary date, Ms. Galindo's affidavit that purports to authenticate the photographs and sketch showing a gate was not prepared until approximately a month after Plaintiffs filed their motion.  Applying the factors identified by the Tenth Circuit, it appears that the belated disclosure of this evidence indicates sandbagging on the part of Plaintiffs and an attempt to create a sham issue of fact.

That is, Plaintiffs' counsel had the opportunity to cross-examine all of Defendants' witnesses and depose Ms. Galindo and other Plaintiffs.  Yet Plaintiffs do not present me with any excerpts of depositions where anyone was questioned about a gate.  The presence of a gate could not be characterized as "newly discovered evidence," and Ms. Galindo surely knew about it at the time of her testimony.  The apparently conscious delay in production and attempt to create a sham issue also justifies not considering the affidavit, photograph and sketch.  *E.g., Lantec, Inc. v. Novell, Inc.,* 306 F.3d 1003, 1018 (10th Cir. 2002); *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 973 (10th Cir. 2001).

For all of these independent reasons, I grant Defendants' motion to strike and proceed to

consider the motions for summary judgment on the premise that there was no gate obstructing the way from the carport to the patio.[2]  All of the remaining facts that are material to the analysis are undisputed.

### B.  Fourth Amendment Claim: Plaintiff Fails To Meet Either Prong Of The *Saucier* Inquiry

#### (1)  First Prong Difficulties & Framework For Analysis

A difficulty in applying the first prong of the two-part *Saucier* test, particularly in a Fourth Amendment context, is determining which of Plaintiffs' pleadings to consider.  *Saucier* speaks both of "allegations" and "parties' submissions."  533 U.S. at 201.  Some decisions focus on the allegations in a complaint, others apparently only focus on the summary judgment materials, while others may focus on both.  *See e.g., Martin v. City of Oceanside,* 205 F. Supp. 2d 1142, 1146-47 (S.D. Calif. 2002) (discussion of problem and concluding allegations in complaint are basis for the first prong).  Because of the way the parties present their positions, in an abundance of caution, I will consider both the allegations in the Complaint and in Plaintiffs' dispositive motions submissions.

The second difficulty in applying the first prong of the *Saucier* test is determining whether to construe the asserted Fourth Amendment right generally or specifically.  *Saucier* appears to suggest that a "broad general proposition" operates in the context of the first prong, and the specific facts of the case vis-a-vis the constitutional right is not in play until the second prong.

---

[2]  In light of my analysis below, if my decision to strike is determined erroneous, I would not conduct an entire trial.  Instead, I would first try the limited factual issue of the presence of a gate.  That is so because  "[q]ualified immunity is 'an entitlement not to stand trial . . . .  The privilege . . . is effectively lost if a case is erroneously permitted to go to trial.'"  *Roska, supra* at *2 (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)).

*See* 533 U.S. at 201.  Some federal decisions follow that approach.[3]  Tenth Circuit and other federal decisions, however, tend to apply a more fact-specific Fourth Amendment rule in deciding the first issue.[4]  In light of the Supreme Court's admonition that the first prong cannot be skipped because "a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established," 533 U.S. at 201, I agree with the approach taken by the Tenth Circuit and engage in a more case-specific discussion with respect to the first prong.  The ultimate result here is unaffected by that choice.

The third difficulty in applying the inquiry is the manner in which the parties have briefed the issues.  In my view, the sequence of events that took place at the Galindo home give rise to five legally-discrete and legally-significant components.  They are:  (1) Mr. Acosta knocking on the front door to look for Elizabeth; (2) the police officers knocking on the front door to help look for Elizabeth; (3) the officers walking around the house to the back porch in an effort to locate someone; (4) their entry into the house upon discovering the open door and the minors that did not rouse, and (5) their efforts to locate the owner of the house and Elizabeth.

Plaintiffs' Complaint, though vague, appears to imply that there is an infirmity with the

---

[3]  *See Martin,* 205 F. Supp. 2d at 1148 (S.D. Calif. 2002)(mere allegation that officers entered home without warrant, consent, or exigent circumstances satisfies first prong); *see also Tamez v. City of San Marcos, Texas,* 118 F.3d 1085, 1093 (5th Cir. 1997) (pre-*Saucier* decision applying similar, if not same, two-prong analysis; allegation that warrantless entry into home to search was unreasonable states a claim and separately considering whether intrusion was unreasonable under the circumstances of the particular case), *cert. denied,* 522 U.S. 1125 (1998).

[4]  *E.g., Roska supra* (warrantless search is presumptively unreasonable unless specific exception applies, evaluating exigency in context of first prong); *Ealum v. Schirard,* 46 Fed.Appx. 587, 593 (10th Cir. 2002) (warrantless entry of home is presumptively unreasonable unless exception to warrant requirement applies; evaluating exigency in context of first prong); *see also e.g., Loria v. Gorman,* 306 F.3d 1271, 1284 (2nd Cir. 2002).

first two components.  Plaintiffs' motion for partial summary judgment focuses primarily on the

third component and, to some extent, the fourth component.  Defendants' motions for summary

judgment focuses primarily on the fourth component and, to some extent, the fifth component.  I

address each component separately below in the context of the first *Saucier*-prong.

### a. Officers And Citizens Can "Knock and Talk" Without Violating The Fourth Amendment

Paragraphs 27 and 28 of Plaintiffs' Complaint and a line from one of their responses seem

to suggest that the "police officers" were obliged to secure a search warrant before first

approaching the Galindo home.  *See Complaint,* ¶ 27 ("Defendant Police Officers did not seek or

actually obtain a lawful arrest warrant for anyone in plaintiff Galindo's home at any time prior to

or during this incident."); *id.,* ¶ 28 ("Defendant seek or actually obtain a lawful search warrant for

anyone in Plaintiff Galindo's home Defendant seek or actually obtain a lawful search warrant for

anyone in Plaintiff Galindo's home at any time prior to or during this incident." [sic]); *Doc. 119* at

15 (maintaining that Mr. Acosta went to the Galindo home after his wife called and while he was

on duty at approximately 11:00 p.m., stating that "[t]his is a time span of approximately 3 ½

hours.  If Defendant Acosta felt urgent concern for his daughter, he could have easily obtained a

search warrant, during this time span.").

The incident in question and my analysis begin with the premise that parental rights in the

care and management of their children are fundamental.  *E.g., Santosky v. Kramer,* 455 U.S. 753

(1982).  Moreover, "'juveniles, unlike adults, are always in some form of custody.'"  *Reno v.

Flores,* 507 U.S. 292, 302 (1993) (quoting *Schall v. Abrams,* 467 U.S. 253, 265 (1993)).  That is

so because "[c]hildren, by definition, are not assumed to have the capacity to take care of

themselves." *Schall,* 467 U.S. at 265.  And, as is pertinent for this suit, "unemancipated minors lack some of the most fundamental rights of self-determination – including even the right of liberty in its narrow sense, *i.e.,* the right to come and go at will." *Vernonia Sch. Dist. 47J  v. Acton,* 515 U.S. 646, 654 (1995).

Plaintiffs do not challenge these principles.  They readily acknowledge and do not dispute that Mr. and Mrs. Acosta were worried about their daughter when she did not come home from work and went missing for hours, or that they "were concerned and responsible parents and . . . it was reasonable to contact the police and request assistance." *Doc. 139,* ¶¶ 15, 40 & 54.

Just as any private citizen may approach residence and seek to speak with the inhabitants, so too may the police.  Simply put, in that circumstance, the Fourth Amendment is not implicated. *See e.g., Rogers v. Pendleton,* 249 F.3d 279, 288-90 (4th Cir. 2001) (and cases and authorities cited therein); *see also Smith v. Marasco,* 318 F.2d 497, 519 (3rd Cir. 2003); *United States v. Hammett,* 236 F.2d 1054, 1059 (9th Cir.), *cert. denied,* 535 U.S. 866 (2001); *United States v. Daoust,* 916 F.2d 757, 758 (1st Cir. 1990).

### b.  *Upon Receiving No Answer, The Officers Can Walk Around The Back Of The House In An Effort To Locate Another Entry And/Or The Occupant*

Plaintiffs argue that upon receiving no answer at the front door, the officers could not go around to the back of the house and enter the curtilage of the carport and back porch without a search or arrest warrant.  The Tenth Circuit appears to have only squarely addressed the issue in *Morehead,* a case involving service of an arrest warrant.[5]  A number of other circuits have

---

[5]    Senior contends that the officers' act of walking to the back of the house and looking through the windows of the shop building and camper violated the Fourth Amendment. The curtilage of a house is protected under the Fourth Amendment to the extent that an individual reasonably may expect

addressed the issue in cases, such as this one, that do not involve carrying out a warrant.  I find

those opinions, and the decisions they rely upon, persuasive because they rest on logic similar to

that in *Morehead*.

    While outside the Galindo residence on their third attempt to contact someone in the

home, Mr. Acosta telephoned officer Rodriquez and reported that he believed Elizabeth was in

the Galindo home and underage drinking was going on there.  *Rodriguez Depo,* at 108.  Officer

Rodriguez was the first on the scene and Mr. Acosta further reported that the Galindo residence

was his sister-in-laws's house, that in the past Elizabeth drank there, and that they believed she

was in the house now because Michael's truck was parked outside.  Officer Rodriguez contacted

the "Minors With Alcohol Tactical Team" or "MATT."  When the team arrived, Officer

Rodriguez briefed Lt. Portillo on the situation.  *Id.* at 110-112.  Thus, there is no dispute that the

_____

> that the area in question should be treated as a home itself. . . . .
> However, even if we assume that Senior could reasonably expect the area
> from where the officers made their observations harbors the intimate
> activity associated with the sanctity of a man's home and the privacies of
> life, . . . the officers' limited intrusion was justified in their execution of a
> valid arrest warrant.
>
>                            * * *
>
> If a law enforcement officer may enter a suspect's house to execute an
> arrest warrant when the officer has reason to believe the suspect is inside,
> the officer most certainly may walk to the back of the house and peer
> through the windows of a shop building and camper located on the
> property when he has reason to believe that the suspect is on the premises.
> . . . The officers knew that Senior resided at the house, and the presence
> of a car in the carport and a truck in front of the house gave the officers
> reason to believe that Senior was on the premises.  Therefore, the mere act
> of walking to the back of the house cannot be considered unreasonable
> given that the officers were executing an arrest warrant.

*United States v. Morehead,* 959 F.2d 1489, 1496 (10th Cir. 1992), *rehearing sub nom United States v. Hill,* 871 F.2d 1461 (10th Cir. 1992) (on unrelated issues).

officers approached the Galindo home for two legitimate purposes – to ascertain whether

Elizabeth was there and whether minors were drinking on the premises.  Thus, because the

officers were on the premises for a legitimate purpose and got no answer at the front door,

consistent with the Fourth Amendment they could to walk around back to try and locate the

occupants of the house.[6]  Indeed, Plaintiffs' own expert agrees with this proposition.  *See e.g.,*

*Doc. 113* (Ken Barnes' deposition at 121 – "I see no problem with knocking on both doors.").

### c. Tenth Circuit Does Not Recognize The Community Caretaking Exception Outside The Context Of Automobile Searches, But Exigent Circumstances Exception Applies

Some jurisdictions recognize a "community caretaking" exception to the warrant

requirement for entry into a home.  The Tenth Circuit is not among those courts that recognize

the exception.  Rather, in its 1994 decision in *Bute v. United States,* the Tenth Circuit agreed with

another line of authority and held that "the community caretaking exception to the warrant

requirement is applicable only in cases involving automobile searches."  43 F.3d 531, 535 (10th

Cir. 1994).  At the time the events in this case took place, the New Mexico courts had not

---

[6]  *See e.g., United States v. Raines,* 243 F.3d 419, 421 (8th Cir. 2001) (officers approach house to attempt to serve civil process on acquaintance of defendant); *Hammett,* 236 F.3d at 1060 (unable to confirm suspicion from ariel view that  that marijuana was being grown, officers enter property from vantage point that they miss the no trespassing sign);  *Alvarez v. Montgomery County,* 147 F.3d 354, 358-59 (4th Cir. 1998) (response to complaint about party); *Smith,* 318 F.3d at 519-20 (response to a complaint); *United States v. Anderson,* 552 F.2d 1296, 1300 (8th Cir. 1977) (officers approach house to ask about a theft); *United States v. Bradshaw,* 490 F.2d 1097, 1100 (4th Cir.) (officers searching for moonshine still approach house to ask owner about abandoned car on his property), *cert. denied,* 419 U.S. 895 (1974); *c.f. United States v. Cavely,* 318 F.3d 987, 994 n.7 (10th Cir. 2003) ("The mere fact that officers went to the front and around towards the back of appellant's house, standing alone, does not establish an invasion of the curtilage."); *United States v. French,* 291 F.3d 945, 953-54 (7th Cir. 2002) (looking for probationer who failed to report, gravel walkway to out buildings that was not enclosed or shielded from public was not within curtilage); *Rogers,* 249 F.3d at 288-90 (distinguishing such decisions in situation where officer undertook general investigation of curtilage in response to complaint about a loud party after owner of the property indicated the noise problem had been taken care of and asked the officers to leave).

decided the issue.  To-date, the New Mexico Supreme Court has not spoken.  A New Mexico

Court of Appeals panel opinion discusses how the law in New Mexico concerning the community

caretaking exception was not clear.  That opinion was not issued until after the events took place

at the Galindo home took place  *State v. Nemeth,* 130 N.M. 261, 23 P.3d 936 (N.M. Ct. App.

2001).

    Under binding Tenth Circuit precedent, therefore, I cannot find that a "community

caretaker" exception applies here as a matter of law.  Nevertheless, the Tenth Circuit does

recognize the exigent circumstances exception to the Fourth Amendment.  "There is no absolute

test for determining whether exigent circumstances are present because such a determination

ultimately depends on the unique facts of each controversy."  *United States v. Anderson,* 154 F.3d

1225, 1233 (10th Cir. 1998), *cert. denied,* 526 U.S. 1159 (1999).  One long-established class of

cases that falls within the exception is where the circumstances pose a threat to the lives or safety

of an occupant in a dwelling – the so-called emergency-aid exception.[7]  This exception applies

when the officers:  (1) have reasonable ground to believe there is an immediate need to protect

someone's life; (2) the search is not motivated by an intent to arrest or seize evidence; and (3)

there is some "reasonable basis, approaching probable cause, to associate an emergency with the

area or place to be searched."  *Roska, supra* at *3.  All three prongs are met here.

    Even if the officers initially thought they were responding to a "loud party" involving

---

[7]  *E.g., Mincey v. Arizona,* 437 U.S. 385, 392-93 (1978) ("The need to protect or preserve life or
avoid serious injury is justification of what would be otherwise illegal absent an exigency or emergency.")
(internal quotations and citations omitted); *Bute,* 43 F.3d at 534 ("Among those 'well-delineated'
exceptions to the warrant requirement are situations in which various forms of exigency exist, see . . .
*Mincey* . . . (individual in need of emergency aid and assistance)");  *United States v. Riccio,* 726 F.2d 638,
643 (10th Cir. 1984) ("The Fourth Amendment does not bar police officers from making warrantless entries
and searches when they reasonably believe that a person within is in need of immediate aid.").

underage drinking, once they arrived at the Galindo residence they were confronted with entirely different circumstances.  At the time the officers went around the back of the Galindo home, they were aware that Elizabeth had been missing for hours, and that the Acostas had made several attempts over the course of several hours to contact people inside the Galindo home.  No one was answering, but the Acostas had heard someone inside and the windows were obstructed.  Upon discovering the open patio door and the kids who admittedly were not responding at all to the officers' inquiries, they were justified in entering the premises to (1) ascertain whether those juveniles were all right, and (2) to see whether Elizabeth was there and in a similar seemingly-dangerous situation.[8]

### d.  Scope of Search Inside House Did Not Exceed Purpose

Plaintiffs' Complaint alleges that upon entry the officers "then began to open closed doors;

---

[8]   *See Tamez,* 118 F.3d at 1095-97 (police justified in entering a home in response to call that shots were fired where they recognized the target of another investigation and could hear noise inside house but had not located a gun or determined whether there were any shooting victims or hostages); *Martin,* 205 F. Supp. 2d at 1150 (community caretaking exception is subsumed by emergency aid exception; concerned father requests police to check on his daughter because he had been unable to reach her for days; entry into home justified because officers had reasonable grounds to believe there was an emergency since cars were in driveway but no one would answer officers' repeated knocking or the telephone, officers were not motivated by intent to arrest or seize evidence, their conduct while in the house was "entirely consistent with their claim that they were searching" for the daughter); *United States v. D'Armond,* 80 F. Supp. 2d 1157, 1168 (D. Kan. 1999) ("Based upon D'Armond's statements, officers knew that one person was inside the trailer.  Yet when officers banged on the front door and around the exterior of the trailer, no one responded from within. . . . Because no one responded to the officers' repeated banging on the trailer, and because there appears no doubt that the officers' commotion would have been heard by anyone inside, the officers were reasonably concerned about the safety of any occupant [in a trailer where methamphetamine was being manufactured]."); *compare Roska, supra* (no exigent circumstances justified warrantless entry into home to take child from parents suspected of harming him as a result of Munchausen Syndrome By Proxy; defendants were aware various doctors long suspected child was a victim; nothing was particularly wrong with the child at the time he was removed from his parents; and at the time of the removal the child's doctor specifically stated that it would be a "mistake" to remove the child from his home); *Loria,* 306 F.3d at 1284 (second response to complaint of loud party; owner of home was arrested when he declared he had nothing to say to the officers and attempted to close the door where officers were standing; however officer testified that "at the time of the arrest no one was in danger and no "emergency situation existed").

and enter and search through the bedrooms" and Plaintiffs "woke up to the presence of armed

police standing over them in their bedrooms."  *Complaint,* ¶¶ 30, 32.  Only Grant County's

motion for summary judgment addresses what happened after the officers entered the residence.

According to that pleading, which is supported by deposition testimony, after entering through the

patio door:

> 13.  Sergeant Portillo and Officer Rodriguez then walked through
> the opened sliding glass door and attempted to wake the children.
> One of the children awoke, Sergeant Portillo asked him if he was
> the owner of the house, the child said "my brother" and started
> walking towards another room whereby the officers followed. . . .
>
> 14.  They approached a room and Elizabeth's boyfriend came out
> and the officers asked him if anyone else was home, whether he had
> seen Elizabeth, had they been consuming alcohol and where were
> the owners of the house.  The boyfriend responded by saying that
> he had not seen Elizabeth, he didn't know where she was and that
> they could look around the house if they wanted to.  He also told
> Sergeant Portillo that he was not the owner of the house and then
> pointed to a room on the other side of the hall. . . .
>
> 15.  Then Sergeant Portillo went to a room across the hall, knocked
> on the door and announced himself several times, but there was no
> answer.  Sergeant Portillo then opened the door and saw the back
> of a man lying in bed.  He closed the door ans waited for someone
> to come out. . . .
>
> 16.  Diana Galindo then came out of that room, Sergeant Portillo
> told him (sic) that they were there looking for Elizabeth and that
> there had been a complaint of underaged drinking in the house.
>
> 17.  While Sergeant Portillo and Diana Galindo were talking,
> Officer Rodriguez knocked on the door to the room in which Diana
> Galindo had come.  He asked the adult gentlemen in the room if he
> could check inside the room and the gentleman said "Go ahead."
> At some point while Diana Galindo was talking to Sergeant
> Portillo, her daughter told her that Elizabeth was hiding in Diana's
> closet.  At that point, Diana Galindo told Sergeant Portillo "She's
> in the closet. Get her."  While inside the room, Officer Rodriguez

> opened the closet door and found Elizabeth hiding at the bottom of
> it.  Officer Rodriguez then said to Elizabeth, Get up, Liz, Let's go."
> Elizabeth was upset and once she got her shoes, Officer Rodriguez
> took her out of the home. . . .

*Doc. 93,* ¶¶ 13-17 (citations to supporting depositions omitted).

The material facts for this analysis are that:  after entering the home the officers

encountered juveniles, who directed them further into the home to locate the owner; at Ms.

Galindo's bedroom, the officers waited until she came out to proceed any further with the search;

and, upon meeting the officers, Ms. Galindo gave them permission to search for Elizabeth.

None of these facts are disputed by Plaintiffs.  Their assertion that the officer asked

Michael "where . . . Liz was at and told him to go into the living room" does not contradict

paragraph 14 above.  *Doc. 119,* ¶ 14 (omission original).  Moreover, the document they cite in

support of Michael's statement is an undated  "interview" that is neither notarized nor

authenticated.  *Id.* (referring to Exhibit 28A).  Ms. Galindo's boyfriend, the man the officers saw

in the bed, merely states that no one had permission to search.  However, he was not the owner of

the home and his assertion is flatly contradicted by Ms. Galindo's deposition testimony that she

told the officers to go fetch Elizabeth.  *Compare id.,* ¶ 17 (referring to Exhibit 25, which states

officers searched entire house without speaking to occupants).

Finally, Plaintiffs assert that the officers opened Ms. Galindo's bedroom door without

knocking, but her testimony is contradictory at best.  *See id.,* ¶¶ 15-16 (referring to Exhibit 22.

At one point she asserts Portillo entered her bedroom "straight up opened the door without

knocking."  *Id.,* Exh. 22 at 73.  At another point where she is questioned about the presence of

Elizabeth in her bedroom closet, Ms. Galindo says she knows Elizabeth was not in her room

"when Reuben [Portillo] knocked." *Doc. 96,* Exh. D at 81.

      Even if I assume for the purposes of summary judgment that the officers did not knock on the bedroom door before opening it, Plaintiffs point to no decision that holds the failure to knock under the circumstances violates the Fourth Amendment.  The officers legitimately entered the home believing the juveniles they saw could be in distress.  Once inside the home all they initially encountered were juveniles.  The owner of the premises had not responded to all of the attempts to call them to the door, and further was not responding to the commotion once the officers were inside the home.  Under these circumstances, the officers had a legitimate concern for their own safety and the safety of others in the home.  Furthermore, it is undisputed that they did not enter the bedroom when they opened the door.  Instead, they saw a person in the bed, closed the door, and waited outside until Ms. Galindo came out.  I therefore find that no Fourth Amendment violation occurred.[9]

---

[9]    Mrs. Cole was understandably upset by the fact that a male and female agent entered her bedroom without knocking and found her nude from the waist up.  This fact is undisputed.  Terribly unfortunate though it was, however, I do not believe the agents' conduct was objectively unreasonable.  As previously noted, the agents had the right to search the entire home.  Moreover, the agents were paired by gender (one male and one female) as they secured the house precisely to reduce, if not eliminate, undue embarrassment to the family. . . .  Still further, once the agents had entered the residence, no Fourth Amendment principle required them to knock on the home's inner doors before entering a room. 2 Wayne R. LaFave, *Search and Seizure* § 4.8(c), at 279 ("Thus, police executing a search warrant for a house, once they have gained lawful entry into the house, need not again state their authority and purpose prior to the entry of each individual room in that house.") (footnote omitted).  *See also United States v. Remigio,* 767 F.2d 730, 732 n. 2 (10th Cir.)["Once law enforcement officials lawfully enter a house, they need not always comply with the knock and announce statute before entering every other closed door within the residence.], *cert. denied,* 474 U.S. 1009 (1985).

*Cole v. United States,* 874 F. Supp. 1011, 1040 (D. Neb. 1995).

### *(2)  Second Prong of Saucier Inquiry & Objective Reasonableness*

"For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other court must be as plaintiff maintains." *Farmer v. Perrill,* 288 F.3d 1254, 1259 (10th Cir. 2002).  Although the "very action in question" need not be previously held unlawful, Defendants are entitled to qualified immunity unless "in the light of preexisting law the unlawfulness [of the officers' conduct is] apparent." *Id.; see also Hope v. Pelzer,* ___ U.S. ___, 122 S. Ct. 2508, 2516 (2002).

In support of their argument that the Fourth Amendment law is clearly established, Plaintiffs simply cite general Fourth Amendment propositions.  It is true that it is necessary to have a warrant to enter a home in the absence of exigent circumstances.  *See Roska, supra* (discussion at § C.1.a.).  But in light of the discussion and cases cited above, I find that Plaintiffs also fail to meet the second prong of their heavy burden.  Rather than establishing that the officers' warrantless entry was unlawful, the weight of authority holds or suggests otherwise under the circumstances of this case.  On the undisputed material facts, the officers' conduct was objectively reasonable in entering the Galindo residence and locating Elizabeth.  As such, Defendants are entitled to summary judgment on this basis as well. [10]

### C.  Abandoned Or Unsupported Claims

The only claim Plaintiffs' pursue with any rigor is their Fourth Amendment claim.  They

---

[10]   *See e.g. Howes v. Hitchcock,* 66 F. Supp. 2d 203 (D. Mass. 1999) (law not clearly established re: officers and teenage drinking; officers could rely on exigent circumstances to justify warrantless entry); *see also Phillips v. Peddle,* 7 Fed.  Appx. 175, 180 (4th Cir. 2001) (community caretaker exception not addressed by Virginia Supreme Court or United States Supreme Court re: residential home; officer reasonably could believe at time of entry occupant needed assistance based on what he was told or observed, and left immediately upon determining occupant was safe; defendants entitled to qualified immunity).

have either abandoned or utterly fail to support their other claims.

Violations of state law do not give rise to a federal cause of action under § 1983. *E.g.,*
*Malek v. Haun,* 26 F.3d 1013, 1015-16 (10th Cir. 1994). Thus, Plaintiff's assertion that the
officers' conduct violates that New Mexico constitutional prohibition against unreasonable
searches and seizures fails to state a claim in the first instance. The same is true for Plaintiffs' new
claim that failure to file a police report contrary to a state statute also violates their right to equal
protection or is the basis for a conspiracy. *E.g., Thompson v. City of Lawrence,* 58 F.3d 1511,
1517 (10th Cir. 1995) (to prevail on § 1985 conspiracy claim, Plaintiffs must "prove both the
existence of a conspiracy and the deprivation of a ***constitutional*** right.") (emphasis added).[11]

Plaintiffs further allege that the events giving rise to their Fourth Amendment claim
violates substantive due process, but their conclusory assertion is their only support. Their entire
argument in response to the Grant County Defendants' motion is "Plaintiffs contend Defendant
Portillo's warrantless entry into Plaintiff's home, was an outrageous act, and should shock the
conscience of this Court. Plaintiffs contend Defendants have failed to provide facts or law in
support of their summary judgment on the issue of substantive due process, and it should be
denied." *Doc. 119* at 18. Plaintiffs failed to respond at all to the Silver City Defendants'
argument on this point. *See Doc. 113* at 31; *Doc. 139.* Conclusory allegations, unsupported by
any citation to authority is grounds alone to grant the motion.

Furthermore, substantive due process is not necessarily a catch-all claim. Where, as here,

---

[11]   As the introduction mentions, Plaintiffs alleged in their complaint that Defendants violated Ms.
Galindo's equal protection rights because she is a Hispanic single parent. They have abandoned that claim
and changed their theory of recovery to the state law report statute in their motion for partial summary
judgment. *See e.g,. Doc. 139,* ¶ 50 ("Undisputed that Plaintiffs are not alleging racial or ethnic bias
directed towards [Ms. Galindo]").

the claim is based on a warrantless search, substantive due process provides no alternative theory of recovery. *E.g., County of Sacramento v. Lewis,* 523 U.S. 833, 843 (1998) ("*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eight Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process"); *United States v. Lanier,* 520 U.S. 259, 272 n. 7 (1997) ("if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *Roska, supra* (substantive due process standard applies to claims of excessive force arising when outside of the context of a seizure); *Ellis v. City of Lindsay,* 1998 WL 879818 (10th Cir. 1998) (same).

Finally, absent a constitutional violation, there can be no municipal liability. *E.g., Trigalet v. City of Tulsa, Oklahoma,* 239 F.3d 1150, 1154 (10th Cir.), *cert. denied,* 534 U.S. 814 (2001).

### D.  Decline Supplemental Jurisdiction Over Any State Claims

As I read Plaintiffs' Complaint, it raises only federal claims.  Even if Plaintiffs Complaint purportedly raises separate state claims, I would not retain supplemental jurisdiction over them. *E.g., Villalpando v. Denver Health and Hosp. Auth.,* 2003 WL 1870993 (10th Cir.) (4/13/03) (is parties "have not shown they have spent a great deal of time on the state law claims, the district court should normally dismiss supplemental state law claims after all federal claims are dismissed . . . before trial. . . .   Courts should be cautious when exercising supplemental jurisdiction over state law claims because [n]otions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary.") (internal quotations and citations omitted).

24

Wherefore,

**IT IS HEREBY ORDERED THAT:**

1.   Defendants' Motion to Strike Exhibits *(Doc. 134)* is GRANTED;

2.   Plaintiffs' Motion for Partial Summary Judgment *(Doc. 101)* is DENIED;

3.   Defendants' motions for summary judgment *(Docs. 92, 112)* are GRANTED;

4.   The following remaining pretrial motions are DENIED AS MOOT:
    GC's Motion in Limine re:  Portillo *(Doc. 95)*
    GC's Motion in Limine re:  Matt Guidelines *(Doc. 94)*
    Plfs' Motion to Strike SC's Supp. Witness disclosures *(Doc. 99)*
    SC's Motion in Limine re:  Matt Guidelines *(Doc. 103)*
    SC's Motion in Limine re:  Acosta *(Doc. 104)*
    Defs' Daubert Motion re: Dr. Sosa *(Doc. 106)*
    Defs' Daubert Motion re: Barnes *(Doc. 108)*
    SC's Motion in Limine re:  Rodriguez *(Doc. 110);*

5.   Agreeing with Magistrate Judge Galvan's recommendation that default judgment in favor of Plaintiffs is not warranted by virtue of alleged discovery abuses, I ADOPT that portion of his recommendation *(Doc. 181);* I overrule the objections to the remaining discussion in that recommendation *(Doc. 189),* not on the merits but simply because they are now moot;

6.   The following remaining discovery motions are DENIED AS MOOT OR ARE ALREADY SATISFIED:
    SC's Motion for Protective Order/Costs *(Doc. 71)*
    Plfs' incomplete Motion to Compel *(Doc. 140)*
    Plfs' Motion to Compel *(Doc. 146);* and

4.   A final order enter concurrently herewith.


_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent.